IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE

| | |
|---|---|
| KAREN DICKENS, <br> *Plaintiff,* <br> <br> v. <br> <br> RICHARD TURNER, <br> <br> and <br> <br> THE CITY OF LEWISBURG, TENNESSEE, <br> *Defendants.* | Civil Action No: _____ <br> <br> JURY DEMAND |

## COMPLAINT

1. Plaintiff Karen Dickens brings this civil rights action for declaratory relief and damages against Defendants Richard Turner ("Turner") and the City of Lewisburg, Tennessee ("Lewisburg") pursuant to 42 U.S.C. § 1983 and the Tennessee Human Rights Act.

### JURISDICTION AND VENUE

1. The Court has federal question jurisdiction for the federal claims in this matter pursuant to 28 U.S.C. § 1331.

2. The Court has supplemental jurisdiction over the related Tennessee state law claims in this matter pursuant to 28 U.S.C. § 1367.

3. Venue lies in this district pursuant to 28 U.S.C. § 1391(b)(2) because all claims related to this case occurred in this district.

### PARTIES

4. Plaintiff Karen Dickens is an adult female resident of Lewisburg, Tennessee.

1

5. Defendant Turner is an adult male resident of Lewisburg, Tennessee. At all times relevant to this Complaint, Turner was the General Manager of the City of Lewisburg's electric department in Lewisburg, Tennessee.

6. Defendant City of Lewisburg is a municipal corporation organized under the Constitution and laws of Tennessee. Pursuant to the Municipal Electric Plant Law of 1935, T.C.A. §§ 7-52-101 *et seq.*, Lewisburg provides electric power to the city through its electric department.

## FACTUAL BACKGROUND

7. The City of Lewisburg has an electric department, through which it provides electricity to the city.

8. Lewisburg sets electric department policies through the three-member Lewisburg Electric Power Board ("Board").

9. Lewisburg selects the members of the Board by mayoral appointments, which must be approved by the City Council. The board members serve four year terms, but may be removed at any time for cause by three-fourths vote of the City Council.

10. For the day-to-day operation of the electric department, Lewisburg's Power Board appoints a General Manager. The General Manager serves at the pleasure of the Board, which can terminate him at any time with or without cause.

11. The Board is responsible for setting electric department policy, while the General Manager controls day-to-day operations.

12. From 1978 until November 19, 2014, Defendant Richard Turner was the General Manager of Lewisburg's electric department.

13. During his tenure as General Manager, Turner maintained a sexist, hostile work environment and sexually harassed many of his female employees. Numerous female electric department employees either experienced or witnessed Turner's decades-long pattern and practice of sexual harassment, including: Peggy Hunter, Audrey Lewis, Alisa Wentzel, Theresa Lancaster, Yvonne Baugher, and the Plaintiff, Karen Dickens.

2

14. Turner often approached female employees without their consent and massaged their shoulders, rubbed their backs, and put his hands under their arms. He would also rub women's bellies and comment that they were "putting on weight."

15. Turner frequently made sexually inappropriate statements and asked invasive, personal questions of female employees. Turner often made "dirty" jokes about sex and would give his opinion of how attractive or unattractive female employees, applicants, and salespeople were. He would talk about how little sex he had with his wife, and ask about his female employees' sex lives.

16. Turner periodically propositioned female electric department employees.

17. Turner sometimes stalked female electric department employees, driving by their homes at night or on weekends.

18. Turner made it clear to the electric department employees that any resistance to his actions would not be tolerated, and that as General Manager he had authority to hire, fire, promote, or demote any employee at any time.

19. The electric department had neither a sexual harassment policy nor an employee complaint policy to provide an avenue for employees to safely complain about workplace misconduct.

20. In 1986, Ms. Theresa Lancaster, who had worked at the electric department since 1971, became Turner's new secretary. Turner proceeded to subject Ms. Lancaster to ongoing sexual harassment.

21. In 1994, Turner moved Ms. Lancaster to Engineering and replaced her with Ms. Peggy Hunter.

22. Ms. Lancaster then appeared at a Power Board meeting, and complained about Turner's sexual harassment and the hostile environment that he maintained.

23. The Board conducted no investigation of Ms. Lancaster's allegations, and took no steps to stop Turner's misconduct.

24. In spite of Ms. Lancaster's allegations, the Board took no action to institute either a sexual harassment or an employee complaint policy for the electric department.

25. After Ms. Lancaster's complaint to the Board, Turner told the electric department staff that anyone who complained about him to the Board in the future would be fired.

26. After the Board failed to act on Ms. Lancaster's allegations, Turner's sexual harassment continued unabated.

27. Turner subjected Ms. Peggy Hunter to sexual harassment, as he had Ms. Lancaster.

28. At some point, Ms. Hunter discussed the situation at the electric department with a member of the Power Board; the Board member told her, "Turner runs this place; we stay out of it."

29. In 1997, Turner replaced Ms. Hunter with Ms. Alisa Wentzel as his new new secretary. Turner kept Ms. Wentzel as his secretary until 2011, subjecting her to severe sexual harassment throughout that period. In 2011, he fired Ms. Wentzel.

30. Shortly after her 2011 termination, Ms. Wentzel complained to the Board about Turner's rampant sexual harassment of her and of other female employees. Ms. Wentzel telephoned Board members Steve Thomas and Eddie Tears, and advised each of them that Turner was sexually harassing female employees and creating a hostile work environment. She also told them that she wanted to discuss her complaint with Board Chairman Joe Moss, and asked Thomas and Tears to have Moss call her. Thomas and Tears each stated that they would have Moss contact her, and stated that the Board would investigate her complaint.

31. The Board took no meaningful steps to investigate Ms. Wentzel's complaint, and Chairman Moss never contacted Ms. Wentzel to discuss her allegations. As before, the Board took no action against Turner and declined to implement either a sexual harassment or an employee complaint policy.

32. On October 17, 2011 Turner hired the Plaintiff, Ms. Karen Dickens, as his new secretary.

33. After Ms. Dickens had been at the electric department for about a year, Turner began subjecting her to sexual harassment.

4

34. Turner would frequently walk up behind Ms. Dickens while she was sitting at her desk, put his hands under her arms to where he was touching her bra, and then squeeze. Ms. Dickens neither wanted nor consented to this contact, but felt forced to submit to it because Turner was her boss.

35. Turner would frequently approach Ms. Dickens from behind and massage her shoulders without her consent. Ms. Dickens neither wanted nor consented to this contact, but felt forced to submit to it because Turner was her boss.

36. Turner would frequently make inappropriate comments on Ms. Dickens's figure, such as, "I love your figure;" "You have a nice package;" "Your body looks better than Whitney's;"[1] and, "I would love to see you in a swimsuit."

37. Turner would frequently comment on Ms. Dickens's outfits, touching her pants while claiming that he just wanted to feel the material. Turner would then say, "I like your pants, but I like what is in them more."

38. Turner sometimes stalked Ms. Dickens, driving by her home at night and on weekends. If she was not home when he drove by, Turner would later comment on her absence to other electric department employees, implying that she was promiscuous.

39. In late 2012, Ms. Dickens became concerned by Turner's constant invasive, possessive, and harassing behavior, and she started avoiding him. However, Turner quickly noticed her avoidance, summoned her into his office, and asked if she was still happy with her job. Ms. Dickens understood Turner's statements to mean that submission to his harassment was part of her job, and that she would be terminated if she failed to submit.

40. Turner's sexual harassment continued and intensified after this meeting, getting worse throughout 2013 and 2014.

41. On occasion, Turner would stand in a doorway that Ms. Dickens needed to pass through, intentionally forcing her to squeeze by him and brush up against him. On one of these occasions, Turner groped Ms. Dickens's stomach while she was passing him. Ms. Dickens

---

[1] Whitney was a co-worker.

5

Case 1:15-cv-00045   Document 1   Filed 05/01/15   Page 5 of 10 PageID #: 5

neither wanted nor consented to this contact, but felt forced to submit to it because Turner was her boss.

42. Sometimes, Turner would corner Ms. Dickens and rub her belly, commenting "What is that?" or "It looks like you are gaining a few." Turner would tell her that if she gained too much weight then her clothes would not fit right. Ms. Dickens neither wanted nor consented to this contact, but felt forced to submit to it because Turner was her boss.

43. On one occasion, Turner came into Ms. Dickens's office, ran his finger up her spine, and said "We need to go to Nashville sometime." Ms. Dickens neither wanted nor consented to this contact, but felt forced to submit to it because Turner was her boss.

44. Anytime that Ms. Dickens became avoidant of Turner, he would again summon her to his office and ask if she was still happy with the job. Ms. Dickens understood his meaning to be that submission to his sexual comments and groping was part of her job, and that she would not be able to continue in the position if did not submit.

45. Turner would frequently express his dissatisfaction with his wife to Ms. Dickens. He would talk about how fat his wife was, and he also stated that he had had a twenty year-long affair. Turner talked about how he refused to buy jewelry for his wife. He then bought a birthstone ring for Ms. Dickens for her birthday, and then later when she did not wear the ring commented on her failure to wear it.

46. Turner made frequent vulgar comments to Ms. Dickens regarding other women who came into the LES office, regarding their physical attractiveness and sexuality.

47. In July 2014, Turner told Ms. Dickens that a former female employee had the nicest breasts he had ever seen, and said that when he had asked this former employee whether or not her breasts were real she had taken him into the vault and shown them to him. Turner then told Ms. Dickens that her breasts also looked nice, and that she wore them where they are "supposed" to be; "up." He then asked, "How much do you make an hour?" Ms. Dickens answered the question, and Turner responded, "Well, I might be able to do something about that." Ms. Dickens understood this suggestion to mean that if she were to show him her breasts, she could receive a raise. Ms. Dickens was extremely offended by the insinuation.

6

48. In early August 2014, electric department employee Doug Fagan became interim General Manager due to Turner's ongoing medical issues.

49. On August 5, 2014 Mr. Fagan interviewed Ms. Dickens about her job and her duties, as part of his process of acclimating to his new role as interim General Manager. During this conversation Ms. Dickens told Mr. Fagan about Turner's sexual harassment, and about the hostile environment maintained by Turner.

50. On August 7, 2014 Doug Fagan reported Ms. Dickens's complaint to Power Board Member and City Council representative Steve Thomas.

51. Lewisburg retained Turner as nominal General Manager until November 19, 2014, when he resigned due to his health condition.

## CLAIMS FOR RELIEF

### COUNT I: FOURTEENTH AMENDMENT EQUAL PROTECTION VIOLATION BASED ON UNWANTED SEXUAL HARASSMENT AND HOSTILE WORK ENVIRONMENT

(42 U.S.C. § 1983; U.S. CONST., AMENDMENT XIV)

(DEFENDANTS TURNER AND CITY OF LEWISBURG)

52. Paragraphs 2 – 51 are herein incorporated by reference.

53. As General Manager of Lewisburg's electric department, Turner's actions relevant to this Complaint were taken under color of state law.

54. Over the course of his 36 year tenure as General Manager, Turner discriminated against female employees by creating and maintaining a hostile work environment, and by forcing them to submit to unwanted sexual harassment as a condition of employment.

55. From the fall of 2012 until July 2014, Turner subjected Ms. Dickens to sexual harassment as a condition of her employment, including unwanted groping, inappropriate sexual comments and propositions, and regular insinuations that her continued employment depended on her continued willingness to submit to his sexual harassment.

7

56. The sexual harassment imposed by Turner on Ms. Dickens was unwelcome.

57. Turner's sexual harassment was pervasive, and effectively conditioned Ms. Dickens's continued employment on her submission to a hostile work environment.

58. Ms. Dickens perceived the work environment created through Turner's actions as hostile.

59. A reasonable female employee in Ms. Dickens's position would have considered the work environment to be abusive or hostile.

60. Turner's sexual harassment discriminated against Ms. Dickens on the basis of her sex, depriving her of her Fourteenth Amendment right to Equal Protection under the law.

61. As a municipal corporation, Lewisburg's actions in operating its electric department and in permitting Turner to sexually harass electric department employees were taken under color of state law.

62. In 1994, and again in 2011, female electric department employees notified the Power Board of Turner's pervasive and ongoing sexual harassment and of the hostile electric department work environment.

63. In spite of the 1994 and 2011 complaints to the Board, Lewisburg took no steps to investigate or stop Turner's sexual harassment and misconduct, and was deliberately indifferent to Turner's ongoing sexual harassment of female employees.

64. Lewisburg never provided a sexual harassment policy or an employee complaint policy for the electric department, even after the 1994 and 2011 employee complaints. Lewisburg was deliberately indifferent to the need for such policies to guard against Turner's ongoing sexual harassment of female employees.

65. In practice, Lewisburg essentially ceded all policy-making authority over the electric department to Turner, granting him unfettered dominion over its policies and operations. Turner's authority was such that he acted as Lewisburg's "alter ego" in the management of the electric department.

66. Because of its deliberate indifference to Turner's long history of sexual harassment, and because of Lewisburg's failure to implement policies to safeguard the rights of its female electric department employees, Lewisburg is legally responsible for the sexual harassment imposed by Turner on Ms. Dickens.

67. Ms. Dickens suffered substantial emotional distress due to the sexual harassment she was subjected to by Turner.

68. Turner's sexual harassment was oppressive and intentional, and he acted in reckless disregard of Ms. Dickens's Constitutional rights.

### COUNT II: TENNESSEE HUMAN RIGHTS ACT ("THRA") VIOLATION BASED ON SEXUAL HARASSMENT AND HOSTILE WORK ENVIRONMENT

(T.C.A. § 4-21-101 *et seq.*)

(DEFENDANTS TURNER AND LEWISBURG)

69. Paragraphs 2 – 51 are herein incorporated by reference.

70. From 2012 – July 2014, Turner subjected Ms. Dickens to sexual harassment as a condition of her employment at the electric department.

71. Turner's sexual harassment created a hostile work environment for Ms. Dickens.

72. Turner's sexual harassment of Ms. Dickens caused her mental well-being to be seriously affected.

73. Lewisburg was put on notice of Turner's rampant sexual harassment of female electric department employees by Ms. Lancaster's 1994 complaint, and again by Ms. Wentzel's 2011 complaint.

74. Lewisburg failed to take prompt and appropriate corrective action to eliminate Turner's sexual harassment.

75. Ms. Dickens suffered substantial emotional distress due to the hostile work environment.

9

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff seeks the following relief:

1) That process issue against Turner and Lewisburg, and that they answer as required by law;
2) That this matter be heard by a jury;
3) That a judgment enter against Defendants Turner and Lewisburg for violating Plaintiff's Fourteenth Amendment Constitutional right to Equal Protection of the laws, and for violating her statutory rights under the Tennessee Human Rights Act ("THRA");
4) That Plaintiff be awarded nominal, compensatory, and punitive damages against Turner and Lewisburg[2] in an amount to be determined by a jury;
5) That Plaintiff be awarded pre- and post-judgment interest as prescribed by law;
6) That Plaintiff be awarded reasonable attorney's fees and litigation costs pursuant to 42 U.S.C. § 1988 and the THRA;
7) That the costs of this matter be taxed to Defendants;
8) For such other relief as the Court deems appropriate.


Respectfully submitted,

_/s/ Kyle Mothershead_

Kyle Mothershead, BPR 22953
414 Union Street, Suite 900
Nashville, TN 37219
T: (615) 982-8002 / F: (615) 229-6387
E: kyle@mothersheadlaw.com

---

[2] Punitive damages against a municipality are not authorized under 42 U.S.C. § 1983, but are available under the Tennessee Human Rights Act.